A11A0277. THOMAS v. BANK OF AMERICA CORPORATION et al.
(711 SE2d 371)

MCFADDEN, Judge.

Rosa Thomas appeals the trial court's order dismissing her putative class action against Bank of America Corporation and FIA Card Services, N.A. Because we agree with the trial court that federal banking law preempts Thomas's claims, we affirm.

We review de novo the grant of a motion to dismiss for failure to state a claim and construe the complaint's factual allegations in favor of the plaintiff. *Hedquist v. Merrill Lynch, Pierce, Fenner & Smith*, 284 Ga. App. 387 (643 SE2d 864) (2007). Viewed in this light, the record shows that the defendants are national banking corporations. In 2002, the federal Office of the Comptroller of the Currency adopted through notice-and-comment rulemaking a regulation authorizing national banks to issue debt cancellation contracts and debt suspension agreements. 12 CFR §§ 37.1 through 37.8; 67 Fed. Reg. 58962 (Sept. 19, 2002).

A [debt cancellation contract] is a loan term or a contractual arrangement modifying loan terms linked to a bank's

extension of credit, under which the bank agrees to cancel all or part of a customer's obligation to repay an extension of credit from that bank upon the occurrence of a specified event. A [debt suspension agreement] is a loan term or a contractual arrangement modifying loan terms linked to a bank's extension of credit, under which the bank agrees to suspend all or part of a customer's obligation to repay an extension of credit from that bank upon the occurrence of a specified event.

67 Fed. Reg. at 58962. Under this authority, the defendants created a debt cancellation product called "Credit Protection Plus."

For 95 cents per $100 of outstanding balance on a credit card account, Credit Protection Plus provides for the cancellation of the account balance or suspension of the minimum payment due if certain specified events — such as job loss, illness, or death — occur. Being employed is a requirement for some of the Credit Protection Plus components. But because the components are bundled, a customer who purchases Credit Protection Plus must purchase all components, including those components for which she is ineligible.

Thomas contends that she purchased Credit Protection Plus on July 9, 2007, when she received a telephone solicitation. She further contends that the scripted telephone solicitation did not inform her that she was ineligible for most components of Credit Protection Plus. Thomas filed this action, alleging: (1) that the defendants committed insurance fraud by falsely representing that all of the bundled components of Credit Protection Plus would be available to her; (2) that the defendants violated OCGA § 33-31-7 of the Georgia Insurance Code by failing to quote the premium rates for the bundled components separately so that she could purchase them separately; (3) that the defendants violated OCGA § 33-31-9 (a) of the Georgia Insurance Code by charging premiums that exceeded the premium rates on file with the Georgia Insurance Commissioner; (4) that the defendants violated the Georgia RICO Act; (5) that the defendants engaged in unfair and deceptive business practices by selling Thomas products for which she was not eligible; (6) that the defendants committed the tort of bad faith by failing to verify their customers' eligibility for Credit Protection Plus and by failing to inform them if they were ineligible; and (7) that there was a partial failure of consideration since the defendants charged all customers — those eligible and those ineligible — the same price for Credit Protection Plus.

The trial court granted the defendants' motion to dismiss Thomas's action, finding, among other things, that federal banking law preempted all of Thomas's claims. Thomas now appeals.

1. In *McCulloch v. Maryland*, 17 U. S. 316 (4 LE 579) (1819), the United States Supreme Court held that federal law prevails over state law with respect to national banking. In 1864, Congress enacted the National Bank Act, which granted nationally chartered banks certain enumerated powers and "all such incidental powers as shall be necessary to carry on the business of banking." 12 USC § 24. See *Watters v. Wachovia Bank, N.A.*, 550 U. S. 1, 10-11 (II) (A) (127 SC 1559, 167 LE2d 389) (2007). To prevent state regulation from impairing the national banking system, Congress provided that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law." 12 USC § 484 (A). See *Watters*, supra at 14 (II) (A) ("Visitorial powers" include the power to inspect a bank's books and to regulate its banking activities. 12 CFR § 7.4000 (a) (2).). "[G]rants of both enumerated and incidental 'powers' to national banks [are] grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank &c. v. Nelson*, 517 U. S. 25, 32 (II) (116 SC 1103, 134 LE2d 237) (1996).

Express preemption occurs when Congress, or a federal agency acting within the scope of its congressionally delegated authority, has explicitly indicated an intention to preempt state law in the text of a statute or regulation. See *Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta*, 458 U. S. 141, 153-154 (II) (102 SC 3014, 73 LE2d 664) (1982). Field preemption occurs "when federal regulation in a legislative field is so pervasive that we can reasonably infer that Congress left no room for the states to supplement it." *Pace v. CSX Transp.*, 613 F3d 1066, 1068 (III) (11th Cir. 2010). "Such field preemption can occur when an agency, acting pursuant to its delegated authority, promulgates regulations that evidence a clear intent to occupy a specific field." *Wells Fargo Bank v. Boutris*, 419 F3d 949, 966 (II) (D) (2) (9th Cir. 2005). And "[e]ven when Congress has neither expressly preempted state law nor occupied the field, state law is preempted when it actually conflicts with federal law." *Pace*, supra at 1068 (III).

2. In ruling that Thomas's state law claims are preempted by federal banking law, the trial court relied on 12 CFR § 37.1, which provides:

> (a) Authority. A national bank is authorized to enter into debt cancellation contracts and debt suspension agreements and charge a fee therefor, in connection with extensions of credit that it makes, pursuant to 12 USC § 24 (Seventh).
>
> (b) Purpose. This part sets forth the standards that apply to debt cancellation contracts and debt suspension agreements entered into by national banks. The purpose of

these standards is to ensure that national banks offer and implement such contracts and agreements consistent with safe and sound banking practices, and subject to appropriate consumer protections.

(c) Scope. This part applies to debt cancellation contracts and debt suspension agreements entered into by national banks in connection with extensions of credit they make. National banks' debt cancellation contracts and debt suspension agreements are governed by this part and applicable Federal law and regulations, and not by part 14 of this chapter or by State law.

That regulation — with its clear statement that debt cancellation and suspension agreements are governed by federal, not state, law — in conjunction with the statutory language that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law," 12 USC § 484 (A), amounts to express preemption. See *Fidelity Fed.*, supra at 153 (II). See also 67 Fed. Reg. 58962, 58964 (Sept. 19, 2002) ("This final rule, together with any other applicable requirements of Federal law and regulations, are intended to constitute the entire framework for uniform national standards for [debt cancellation contracts] and [debt suspension agreements] offered by national banks. Accordingly, the final rule states that [debt cancellation contracts] and [debt suspension agreements] are regulated pursuant to Federal standards . . . and not State law.").

Further, as the defendants argue, the Comptroller of the Currency's extensive framework of regulation indicates an intent to occupy fully the area of debt cancellation and suspension agreements, and therefore amounts to field preemption. *Spinelli v. Capital One Bank*, 265 FRD 598, 605 (IV) (C) (M.D. Fla. 2009) ("[T]he [Comptroller of the Currency's] comprehensive scheme of regulation leaves no room for state law when it comes to Debt Agreements."). The regulations authorize national banks to enter into debt cancellation contracts and debt suspension agreements (12 CFR § 37.1); prohibit certain practices, including misrepresentation (12 CFR § 37.3); provide the terms for refunds (12 CFR § 37.4); mandate disclosures (12 CFR § 37.6); and require national banks to obtain their customers' written, affirmative election to purchase the product and written acknowledgment of receipt of the disclosures (12 CFR § 37.7).

In spite of the explicit dictate that debt cancellation contracts are not governed by state law, as well as the implicit federal intent to occupy the field, Thomas contends that states may regulate the rates charged for debt cancellation contracts because the federal regulatory scheme does not explicitly pronounce the rates banks may

charge, and such state regulations do not interfere with any legitimate business activities of national banks. And, she argues, debt cancellation contracts are insurance, so the rates that banks charge for them are subject to regulation by the Georgia Insurance Commissioner.

As for Thomas's second argument, the Comptroller of the Currency has explicitly stated that debt cancellation contracts and debt suspension agreements are banking products, not insurance. See 67 Fed. Reg. at 58962, 58975. In its explanation for adopting the regulation allowing national banks to issue debt cancellation contracts and debt suspension agreements, the Comptroller of the Currency wrote that its ruling was

> not intended as a means for National Banks to invade the field of insurance. Rather, it is a recognition by this Office of a National Bank's right to protect itself by the establishment and maintenance of appropriate reserves against anticipated losses in connection with its lending activities under 12 USC § 24. The necessity to maintain such reserves and to adjust its charges in relation to both reserves and the risk involved in a particular transaction has long been recognized as an essential part of the business of banking.

67 Fed. Reg. at 58963. Rejecting one commentator's assertion that states have the authority to regulate debt cancellation contracts insurance, the Comptroller of the Currency stated that

> [debt cancellation contracts] and [debt suspension agreements] are banking products authorized under 12 USC § 24 (Seventh). This final rule, together with any other applicable requirements of Federal law and regulations, are intended to constitute the entire framework for uniform national standards for [debt cancellation contracts] and [debt suspension agreements] offered by national banks. Accordingly, the final rule states that [debt cancellation contracts] and [debt suspension agreements] are regulated pursuant to Federal standards, including [12 CFR] part 37, and not State law.

Id. at 58964. None of the cases Thomas cites for the proposition that debt cancellation contracts are insurance involved national banks. E.g., *Monk v. C. E. Osgood Co.*, 249 Mass. 473 (144 NE 371) (1924) (involving corporation in the business of selling household furniture, carpets and similar articles on installment plan); *Justice v. Branch Banking &c. Co.*, Case No. 2:08-230 (2009 U.S. Dist. LEXIS 24668,

2009 WL 853993) (S.D. W. Va., decided March 24, 2009) (involving state chartered bank).

It is true, as Thomas contends, that the federal regulatory scheme does not explicitly set the rates banks may charge for debt cancellation contracts and debt suspension agreements. The Comptroller of the Currency has spoken on the issue, though. It has stated that "a regulatory approach that includes price controls as a primary component is not warranted" and that its "regulations reflect the fact that national banks may set fees subject to standards of prudent banking practices." 67 Fed. Reg. at 58964. It is clear, therefore, that the Comptroller of the Currency has determined that debt cancellation contracts are not subject to state laws, including state insurance laws, and that banks may charge fees in accordance with prudent banking practices, regardless of state insurance law.

To the extent that the Comptroller of the Currency has determined not to specify the fees banks may set, its determination has preemptive effect because "[w]here a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, then [a] pre-emptive inference can be drawn — not from federal inaction alone, but from inaction joined with action." *Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.*, 485 U. S. 495, 503 (II) (108 SC 1350, 99 LE2d 582) (1988). "Where such a decision *not* to regulate represents . . . a considered determination that no regulation is appropriate, that choice preempts contrary state law imposing governing standards." (Emphasis in original.) *Wells Fargo*, supra at 966 (II) (D) (2).

Thomas further argues that the 2010 enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act, PL 111-203 (2010), confirms her position that federal banking law does not preempt her claims based on Georgia consumer protection law. (The Dodd-Frank Act can be found at http://www.cftc.gov/ucm/groups/public/@swaps/documents/file/hr4173_enrolledbill.pdf.) The provision of the Act on which she relies, Section 1044 (a), amends the National Banking Act to provide:

> State consumer financial laws are preempted, only if—
>
> (A) application of a State consumer financial law would have a discriminatory effect on national banks, in comparison with the effect of the law on a bank chartered by that State;
>
> (B) in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in *Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.*, 517 U.S. 25 (1996),

the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers; and any preemption determination under this subparagraph may be made by a court, or by regulation or order of the Comptroller of the Currency on a case-by-case basis, in accordance with applicable law; or

(C) the State consumer financial law is preempted by a provision of Federal law other than this title.

We do not consider the effect of the Dodd-Frank Act. The Act does not apply to Thomas's purchase of Credit Protection Plus because her purchase predates the Act. See Section 1043 ("This title . . . shall not be construed to alter or affect the applicability of any regulation, order, guidance, or interpretation prescribed, issued, and established by the Comptroller of the Currency . . . regarding the applicability of State law under Federal banking law to any contract entered into on or before the date of enactment of this Act. . . .").

We must defer to a federal agency's reasonable interpretation of a statute it is charged with administering. *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U. S. 837, 844 (II) (104 SC 2778, 81 LE2d 694) (1984); *Schneider v. Susquehanna Radio Corp.*, 260 Ga. App. 296, 299-300 (1) (581 SE2d 603) (2003). And the Comptroller of the Currency's interpretation of the National Bank Act must be given "great weight":

It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws.

*Clarke v. Securities Indus. Assn.*, 479 U. S. 388, 403-404 (III) (107 SC 750, 93 LE2d 757) (1987). Indeed, the Comptroller of the Currency's judgments and regulations promulgated with the intention to preempt state law are subject to judicial review only to determine whether they are unreasonable, unauthorized or inconsistent with the underlying federal statute. *Fidelity Fed.*, supra.

The superior court did not err by concluding that federal law preempts Thomas's claims and that Credit Protection Plus is not insurance.

3. Because we have determined that federal banking law preempts all of Thomas's claims, we do not reach her remaining enumerations of error.

*Judgment affirmed. Smith, P. J., and Mikell, J., concur.*

DECIDED JUNE 6, 2011 —

Hurt, Stolz & Cromwell, James W. Hurt, Jr., for appellant.
King & Spalding, Dwight J. Davis, Phyllis B. Sumner, Justin C. Jeffries, for appellees.